Colcock J.
delivered the opinion of the Court.
This was an action on an endorsed note, tried before me, in May Term, 1814.
in this case Mr. Holmes, who resided with the _ - i-i . iii notary as a clerk, produced a minute book kept •f ' A I: by himself and the notary, and said he was confident that he left the notice with the defendant, or at his house. The handwriting of de- > , ° iendant was admitted, and the plaintiff closed. On the cross-examination of the witness, he said . ' he had no distinct recollection of this transaction, without a reference to his Memorandum Book. . He could not say whether he saw the drawer and endorser personally. When the x parties could not he found, it was the custom of the notaries to insert in protest for the drawer or endorser, “ I cannot pay the note.”
The defendant’s counsel then proposed to examine as a witness the drawer, as it was said, to account for the notices. There had been a verdict against him on the same note. This I refused, on the ground that the drawer was incompetent, being interested. The verdict was for the plaintiff; and a motion is now made for a new trial, on the grounds, that,
1st. The evidence offered by Holmes was insufficient, because he had derived his information from his Memorandum Book, and because *424 I told the Jury that this was more satisfactory than a reliance on memory.
2d. Because I erred in rejecting the drawer as a witness, he not having any interest in the event of the suit. >■
On the first ground there can be no difficulty; for if a witness is not allowed to recur to a Memorandum Book of such transactions as these in a large and populous city, there would be many instances of a defect in testimony, even where the notices had been duly given. The notary is called on, perhaps years after the transaction, and can it be supposed that one engaged in such an infinite number of cases, all of the same nature, could retain in his memory an exact account of the day, and place, and manner of giving the notice ? — At all events, it is sufficient evidence to go to the Jury.
The second ground opens to my view a field of contest, in which many able champions have been long contending. But, believing that I am supported by authority and reason, and urged by the imperative commands of duty, I venture to approach it. Amidst this collision of opinion, it is not difficult to discover that the advocates on both sides have exceeded the limits which have been established by authority or prescribed by reason. On the one hand, it has been said, that in no case whatever shall a man be permitted to invalidate his own deed ,* and on the other, that an interest, however remote, even *425 to the question put, shall exclude a witness. Gilb. Ex. 109. I think the truth will be found between these extremes, and that the case before us is not embraced in either of them.
The rule I would lay down, would be this— will the witness be a gainer or loser by the event of the suit in which he is called to give evidence ? If so, he is incompetent; and that whether the verdict can be given in evidence in another suit, or not. For it is obvious, that this circumstance is not the only criterion of interest. How many cases are there to be found, in which there may be a certain, direct and immediate interest in one called to be a witness, and yet the verdict in the case, may not be evidence for or against him; as in the case of all who are called to increase funds, from which they may derive a benefit, or to create them. 5 Johnson’s Rep. 256. 2 Dallas, 50. 1 Mass. Rep. 239. 2 Day, 466. In support of the rule, which I have attempted to lay down, and which will be found to be as old as any known to the common law, I have the decided opinion of Ch. B. Gilbert, (Gilb. Evi. 106, 7) and Mr. Justice Butter (Buller’s Nisi Prius, 284,) as well as those of other judges of later times, much distinguished for abilities. See Bent, and Baker, 3 Term Rep. 36. Walton and Shelly, 1 Term Rep. 300, and a number of other cases, which I shall comment on, when I come to speak of the case of Walton and Shelly. But this rule has lately been innovated ori, in a *426 few cases, in which it is said, a liability for costs only, shall not exclude a witness. To these I oppose, not only the general doctrine as above • laid down, but the particular cases of Vausaut vs. Bioleau, 1 Binney, 444. Butler and Warren, 11 Johnson's Rep. 57. Phil. Evi. 53. 3 East, 7, 13. 2 Hen. and Mun. 467. 7 Cranch, 268. It will not be necessary, 1 presume, after having stated the nature of this action, and relative character of the parties, to shew that the drawer in this case was interested. 4 Term Rep. 491. It was, however, contended that where the witness has an interest, inclining him to each of the parties, so as upon the whole, to make him indifferent, he will be competent to give evidence for either party: and that was the case, it was said, in this action, except as to costs, which it was contended by the authorities above referred to, were not to be considered as an objection. I do not controvert the rule, that where the witness has such an interest as to incline him to both the parties in the same degree of bias, that he may be admitted; but I think it would have been more safe, that such a rule had never been established, because I believe it to be predicated on false premises. , I do not believe it possible that a witness can stand in such relation to both parties as not to have a greater bias towards the one than the other; and if he have a bias, and proceeding from an interest, he ought not to be a witness. If, however, the premises are cor *427 rect, I admit the rule. But I say, in its application, the utmost caution should be used to ascertain, that the interest is not greater on one side than the other. For so far as the rests upon authority, I think there can be no doubt when I recur to the cases above mentioned. In the case in 3 Easl, so late as 1802, Lord Ell.mborough says, “ The governors may not be liable to pay the costs, out of their own pockets, but in the first instance, and quoad the appellant, they are the persons against whom the Legislature have directed the sessions to award costs. They are liable in the first instance, although they may be afterwards reimbursed out of the parochial fund. Yet they are not competent.” Here a mere temporary liability was sufficient to exclude. In the case of 11 Johnson, which is, perhaps, as directly in point as a case can be— for the person offered as a witness was liable for costs, and was called to prove the service of a notice — the Court said, the rule is stubborn and inflexible, that if a witness has a direct interest, however small in the event of the cause, he cannot be admitted to testify upon the trial in favour of that .interest in any respect or degree. In the case from 1 Binney, Boileau was objected to as a witness on several grounds, but the principal one was his liability for costs. He was admitted by the Court below; and upon a writ of error the Court above decided, that he was not a competent witness, on the ground of his being ac *428 countable for costs — a motion was made to quash the writ of error, which was refused. In the case from 2 Hen. and Mun. it was decided that appellee cannot be a witness for his co-appellees, either upon his releasing to them his interest in the subject in controversy, or upon his or their depositing with the clerk a sum of money sufficient to cover costs. It can scarcely be necessary, at this day, to say any thing on the reason of the rule. The object of all law is to restrain the vicious propensities of man. It is certainly unwise in that system which is intended to restrain the depravity of man, to place him in a situation in which he must be tempted to swerve from his integrity. It is said, however, that admitting it to be correct, that those who are interested to a great amount should not be permitted to, give evidence; yet, that where they are liable for costs only, they should not be excluded; although, for the honour of human nature, there are those who would not be influenced by the consideration of the usual amount of the costs of a suit, yet such, in comparison of the whole, are few in number. To administer justice, under such circumstances, it would be necessary to establish a scale by which to graduate human integrity; and when the degree of integrity which the witness may possess is ascertained, to fix on the quantum of interest which would be sufficient to lead him astray. In one ease it is said, if the witness be answerable for *429 damages as well as costs, he shall not be admitted to give evidence. There may be one case in which the costs alone would amount, to mope than costs and damages in another. Such the absurdities in which we must be involved when we depart from long established and well tried rules. The counsel for defendant objected to the authority of Walton and Shelly, and urged that it was not in point, inasmuch as it established a different position from that contended for in this case: viz. That a person is not suffered to impeach a security which he has given, though he be not interested in the event of the suit. I will not now consider whether the witness was interested or not. The case is analogous in this, if the doctrine contended for by the defendant’s counsel were correct,-that a liability for costs did not exclude the witness, yet the principle in Walton and Shelly would operate to exclude him. It has been §aid, this case, (Walton and Shelly,) is not authority, and therefore can weigh nothing with the Court. It is expressly recognized as authority in the case of Cantey and Sumpter, 2 Bay, 93; and if the solemn decisions of our courts, published by, one of our Judges, is not to establish the law, I am at a loss to know how it can become settled. If, however, it is necessary to support the case by other authority, I think it is well supported as to negotiable instruments, by the cases of Coleman and Wise, 2 Johnson, 165; 3 Mass. 27, and 565 ; 1 and 2 Esp. 177; 4 Mass. 156, 159; 2 Dal- *430 ; 1 Hen. and Mun. 175; 1 Day, Cases in Error, p. 18; 1 Esp. 289; 10 Mass. 502; and by a number of other cases referred, to by these. The case- of Jourdaine and Lasbroke was said to have overthrown the case of Walton and Shelly. Although there may be some objections to the latter as reported, the principle is certainly a just and honourable one. Is it not at least unjust to suffer a man, who has given currency to a paper by putting his name to it, (after it shall have passed through many hands, and have been considered as a bank-bill,) to come into Court and destroy its validity by the declaration of a fact which must have been within his knowledge at the time he endorsed it? In my mind, there is no difference between such an act and forgery. I think the case which establishes such a doctrine needs some apology. Upon an examination of it, it will be found in this. The revenue had been defrauded; and an over, anxious zeal to protect it, 1 conceive, led to the determination. Ashhurst, who dissents from Lord Kenyon and Grose, asks, if this act, (stamp,) which was passed since the case of Walton and Shelly, is to be considered as repealing the rules of evidence established by it; and Gross says, “ Because a man shall not be permitted to break his faith with the public, shall he not therefore be a competent witness for the crown ? The answer is, he may undoubtedly be a witness for the crown on a criminal prosecution; but ought he, there *431 fere, to be a witness for himself? And again, if upon the ground of interest alone he is determined to be incompetent, we shall almost as effectually repeal the statute, as if we had said the objection shall not be made by this defendant.” And in the latter part of his opinion, he states the case of the King vs. Atwood Sf Robbins. The prisoners were convicted on the testimony of an accomplice, unconfirmed by any other witness as to their identity, and the conviction was afterwards held good by the Judges! Lawrence, J. says, “ It cannot be denied, but that allowing this defence may have its mischiefs and inconveniences, and tend much to weaken the credit of notes; but on the other hand, if he be hot allowed, the provisions of the statute on which a considerable part of the'revenue depends, would be eluded.” Thus it is manifest,' that the rights of the individual were lost sight of in the attention to the interests of the government, and the case was decided on the rules of the criminal law. Why not suffer the innocent holder of the note to recover his money which he had paid for the bill, and then prosecute the guilty drawer, who had violated the stamp act ? The advocates of this case, acknowledging that the Judges were anxiously intent on protecting the revenue,... ask, if the Judges were not right to do so? Had this been a criminal prosecution, they would, no doubt, have been in the correct discharge of their duty. But as the Legislature *432 ha<l not thought it necessary to protect the revenue, by declaring that those interested in such unstamped paper should be witnesses, I cannot that it was the duty of the Judges to violate the rules of law to effect' this object. I say violate the rules of law, because if the witness was interested, he was not admissible by the rules of law. And I can scarcely believe it possible that a doubt can exist as to his interest. He was the endorser, and it is therefore presumable may háve received value for the bill. The case, in my opinion, is utterly indefensible. I have shown, by the cases above referred to, that the case has been long condemned. In the case of 4 Mass. p. 156, 159, Judge Parsons examines the English cases, and confirms the rule in Walton and Shelly, on general principles. In the case of Hen. and Mun., Lyon, Justice, says, the case of Walton and Shelly is better law than Jourdaine and Lasbroke. Upon the whole, I think it is clear that the drawer Was properly excluded, and I am therefore against the motion.
Bay, J. concurred.
Johnson, J. was against a new trial. He thought the witness inadmissible, because if the plaintiff recovered against the endorser, he would be bound for the costs. It was, therefore, his interest to defeat the action.
Cheves, J.
I think the maker of the note was an admissible witness.
*433 The authority of Walton vs. Shelly, (1 T.R.p. 296,) has never been acknowledged in this State, not even with the limitation which was imposed upon it in Bent vs. Baker, (3 Term Rep. p. 27.) The case of Cantey vs. Sumpter, (2 Bay's R.p. 93,) determined no more' than that the plaintiff on the record, who was liable to the payment of costs, should not be received as a witness; and he was inadmissible, notwithstanding he might be entitled to ultimate remuneration. (3 East, 7.) We are, then, untrammelled by the authority of Walton vs. Shelly, and are free to examine its principle, and to adopt it or not, as we shall think most consonant with the general rules and principles of evidence, the reason of analogous cases, and the general usefulness of the rule. The case of Walton vs. Shelly cannot be said to have been established as an authority, even in the English Courts. It was bottomed on a principle, which was abandoned almost as soon as it was adopted, viz. quod nemo allegans suam turpitudinem est audiendus; for in Bent vs. Baker, finding that it would be intolerable as a general rule of practice, it was confined to one single description of cases, so as to save the authority of the .case on the point decided, and diminish the mischief as far as possible; and it seems to be no rash conclusion to, say, that if the lights which were shed upon the subject, in Bent vs. Baker, had been enjoyed when the case of Walton vs. Shelly was deter-. mined, we should never have had this maxim for *434 a momfent introduced into the rules of evidence Even with the limitation of Bent vs. Baker, the s°ber, practical wisdom of Lord Kenyon revolted the principle; and notwithstanding the reporter, in the latter case, has made him approve of the rule as applicable to negotiable instruments, we find him, in 7 T. R. 597, disavowing the language attributed to him, and declaring that he never recognized, in the most limited form, the principle of Walton vs. Shelly. He struggled against it, until the case of Jourdaine vs. Lasbroke (7 Term Rep. 597,) when we find the principle completely over-ruled, and the question has never since been agitated in the English Courts. But while this principle, as limited by the case of Bent vs. Baker, appeared to be the settled law of England, it was incautiously, as I think, adopted by many of the tribunals of the United States. Having been adopted and settled by repeated confirmatory decisions, whether it be wise or not, it has become the law of these tribunals, and they must bear it; at least, they have.so far borne it. I acknowledge it to be stated in their bo'dks as the received law of the Courts of New-York, Massachusetts, and Pennsylvania, that a party to a negotiable instrument is incompetent to prove it to have been originally void. I have not examined all the cases on points collateral to the general principle, which have occurred in these States. But, by one example, let us show how painfully they struggle under the burden of this *435 rule. In New-York, it was determined, in Winter vs. Saidler, (3 Johns. Ca. 34,) that a party to a negotiable instrument was incompetent to prove it void in its creation; and their Courts have recognized this, as the settled law of the State. Yet in Barker vs. Arnold, ( 1 Caines, 258,) .they determine that an endorser shall be permitted to prove that the note was endorsed after it became due. Now is it possible to wink so hard as not to discover,"that every thing essential in-- the rule is violated here ? By endorsing the bill, the witness said to the endorsee, “ this is a valid and unsatisfied security for the. sum contained in it.” Yet this decision permits him tó divest it of the privileges of a negotiable instrument, and, by proving that it was endorsed after it became due, to let in proof that it was void in its creation. -The only distinction of which this case is susceptible, is, that if the note was due at the time of enclprsement, it was in effect not a negotiable, instrument, and was subject, in the hands of tfye endorsee, to every defence which could have been made by the endorser; and therefore the rule was not violated, it is said. If there were any soundness in this distinction, it would preserve the operation of the rule in the case of an honest »witfiess, where its protection would be unnecessary ; but it would be slighter than a cobweb, where its protection would be most wanted: for when the witness is base enough to be willing to add perjury to fraud, however the fact bé, he *436 can establish the means- of impeaching the note in its creation. But what is the essence of the rule ? That, as regards the question, a negotiable instrument is to' be taken according to its legal import upon the face of it; and that a party to it shall givé no evidence to invalidate it. Now it is as much a part df the legal import of an endorsement Without date, that it was endorsed before the note was due, as that the money payable by the note was due, and it is always presumed until the contrary is proved. Does not, then, the endorser invalidate the apparent legal effect of the endorsement, who proves that it is divested of that legal effect? But even this distinction is not left to the advocates of this rule; for in a very late case, Woodhull vs. Holmes, (10 Johns. Rep. 231.) the endorser was permitted to prove, “ that neither he nór the maker ever received any consideration for the note ; that he delivered it to a third person, in order to have it discounted at the bank, who, instead of offering it at the bank, put it into the hands of a broker.” Here the note was not doe. But it is said, in the opinion of the Court, that the witness was called to prove facts subsequent to the due execution‘of the note. With a just deference for the learned tribunal which pronounced this opinion, it appears to me to evade the rule, and to put the decision on an unsound construction of an equivocal term — due execution, if it means the mere acts of writing, signing, and endorsing the note, *437 then the facts to be testified were subsequent to the due execution of it; but if it mean the delivering it into circulation, the creation of it as a prima facie obligatory instrument, then I say, they were not subsequent, but they were the very acts which gave it a prima facie legal existence, which the rule of Walton vs. Shelly does not permit parties to the instrument to invalidate. What was the witness called'to prove ?— that the note was given without consideration?— that it was, therefore, void; that is, void in its creation ? If the object of the rule be to estop the parties to it, by the face of the .paper, or to protect and give confidence to the holders of a negotiable paper, where is the distinction ? But if there be a distinction, ’ which I profess myself utterly unable to see, we naturally inquire, is if at this day that these subtleties are to be voluntarily adopted ?
In a still later Case, (White vs. Kibling, 11 Johnson's Rep. 128,) in an action by a second endorsee against the maker, the endorser of the note, , who endorsed it to the plaintiff before it became due, was permitted to prove that it was paid at the time he endorsed it, and' that the plaintiff was at the time informed of the fact. Now the rule is, that the parties to a negotiable instrument shall not be permitted to prove any thing in contravention of the legal effect of the instrument at the time they became parties to it. In the case of Barker vs. Arnold, it was. attempted *438 . to show, that the note had lost its negotiable character when it was endorsed, because it was then past due; but that ground, which was "maintained with difficulty in that case, is not found in the last cited case, and the broad ground is taken, that the party to a fraudulent act may be a witness to prove the fraud, and invalidate a negotiable security which his own act held out to the world as valid. The witness in Walton vs. Shelly was a second endorsee; so was the witness in this last case: and the cases are precisely the same, except that in the first case, the ground of invalidity was usury in the creation of the notes, and in the last case, payment before it was endorsed or due. Can there be any distinction between the stages of' the circulation when the cause of invalidity occurred, or one cause of invalidity and another? The rule is not, that the parties to the instrument shall not be permitted to give evidence that it was invalid in its creation merely, but that no party to the instrument shall be permitted to give evidence to show it was invalid at the time he continued its circulation, and held out upon its face to the world the usual signs of confidence and credit. A party whose name is upon the paper, may, perhaps, consistently with the rule, be permitted not to show that his own act was an invalid one, but that the security had been satisfied subsequently to his putting his name upon it. The cases in which Lord Kenyon is reported to have made *439 this distinction prove no more. The point he decided, if, indeed, he did decide any case which admitted the principle of Walton vs. Shelly, is thus very correctly stated by Mr. Day, in note of these cases, to Rich vs. Sopping, (1 Esp. Rep. 177.) The principle of Walton vs. Shelly was distinctly stated by Lord Mansfield to be, that no party who had signed a paper, (and all the pases clearly show, that this applies to endorsers as well as drawers and makers of negotiable instruments,) shall be permitted to invalidate an instrument so signed. But Lord Kenyon, in Jourdaine vs. Lasbroke, expressly states, that he never did adopt the principle, that he not only held a different opinion, but had always acted upon that opinion at Nisi Prius, where these cases are said to have been decided by him. Even these cannot then be considered as legitimate -exceptions to the admitted principle of Walton vs. Shelly. Mr. Justice Buller, who was the last English supporter of that case, in. the case of Phetheon vs. Whitmore, (Peake’s Cases, 40.) declared, he thought these cases within the rule. In Adams vs. Pingard, (Peake's Cases, 118.) he says,it would be attended with the most injurious consequences to society, if these securities might be cut down by the persons passing them.” _ What then becomes of the ground of distinction in the two last cited cases from Johnson’s Reports ? And I ask, if the Courts of New-York have not abandoned the principle entirely, *440 whether they have not maimed it exceedingly, and whether it is not extremely difficult to say how and when it shall be applied ? The maxim is certainly with them no longer, “ Nemo allegans suam turpitudinem est audiendus." This maxim never had, in the common law, as numerous authorities clearly prove, any relation to witnesses. It never was heard of before Walton vs. Shelly, as many learned Judges have declared. (Vide also Swift's Evi. 96; and Evans' Edit. of Pothier on Cont. 2 Vol. 318, Appendix.) It is contrary to the spirit, (admitted by all to be wise,) of the modern practice, which is continually endeavouring to reduce the number of cases of incompetency. So much, then, for authority, precedent, and analogy. Let us now examine it on the principle of policy, in relation to negotiable instruments, which is the only ground on which it is any where now retained. The English Courts have, as we have seen in Jourdaine vs. Lasbroke, not deemed this sufficient to sustain it; and there is not, and never has been, a nation, on earth so much interested in the credit of negotiable paper. They are, too, not the worst, if they be not the best, judges of the means of preserving this credit. The principle on which it has any tendency to sustain the credit of negotiable paper, is, that innocent holders of such paper may be protected against all objections which may have attached to it in previous hands. This is most abundantly and effectually done by *441 the general law merchant, where that law is not controlled by legislative acts on the ground, in the legislative judgment, of some superior public policy. Is it not seen, then, xthat this is but ’ a policy of the Courts against the policy of the Legislature? And shall the rules of evidence, which ought, as far as possible, to apply alike to all times, circumstances, and laws, be bent to control -a particular legislative policy ? How impotent, too, will such an endeavour be, if the Legislature should choose, as it has done in this state, in the case of usury, to establish the evidence of the case, as well as the law'of the contract? There is but one case under the laws of this state or the union, in which, in the Courts of this state, a negotiable instrument can be invalidated in the hands of an innocent holder, and in which he could be protected by this rule of evidence; that is under the statutes against gaming. This, and no more, will be the mighty effect of this rule. The case of Jourdaine vs. Lasbroke has been sometimes condemned, because it has sacrificed, it is said, a principle of evidence to a principle of revenue. ' This objection begs the question, that the principle of Walton vs. Shelly was a principle .of evidence known to the laws of England. But all l mean to say at present, is, that if the point of the decision can be justified under any circumstances, and I think it can under all, no case could be more justifiable than that. The fraud which *442 was to be repressed, was one on the public revenue, in an article which ranks as third in amount and importance among those which the ordinary public revenue of the kingdom. If any interest of society or government be Worth preserving, was not this ? At a moment when the nation was groaning under distressing burdens, which would be rendered the more tolerable by distributing.them equally, and preventing all from fraudulently evading them, was it not a time and a subject, of all others, on which it became proper to lay aside a novelty, for so it seems to have been finally considered by the English bench and bar, and to return again to sober and practical principles ? The want of a stamp probably rendered the instrument in that case invalid. But in a like case here, that would not be the consequence. It would only require the payment of the stamp duty, and a small penalty. The application of the principle, however, and the means of evading the stamp duty, in a thousand - instances might be easily contrived, and the secrecy of these contrivances this rule would render inviolable. Thus it results, that the rule of Walton vs. Shelly will have no protective operation but in two cases: 1st. Where the holder has notice of the fraud or defect; and then it enables him to conceal the fraud, and to take advantage of it. Innocence is a more perfect shield than Walton vs. Shelly in all other cases, except, *443 2dly, bases in which the Legislature shall from weighty considerations of policy have made ex-eeptions. I will conclude this subject in the Words of a learned Judge of our own State, (Chanc. De Saussure,) who says, “ The rule, as laid down in Walton vs. Shelly, has been found inconvenient in practice. It has been found to shut up the avenues of truth in many cases, where accomplices, or persons unwarily drawn in to partake in some illegal or fraudulent transaction, were willing to redeem their error, and disclose the truth.” He says again, “ In this collision of opinions, (alluding to those which have existed on this subject,) among such eminent Judges, we are free to resort to principles.” (3 De Saussure's Rep. 224.) And doing so, I am decidedly and clearly of opinion, the rule of Walton vs. Shelly is in one view useless, and in another greatly pernicious.
But if there be any exception to the rule, that no one shall be permitted to give evidence against the validity of an instrument which he has signed as drawer, maker, or endorser, the case before, us is one of the clearest of those exceptions. Here the maker was called to prove that the endorser had not received notice df the dishonouring of the note, a fact clearly subsequent to any act of his, as a party, to the creating or passing the bill; and on that ground, if these cases be authority, the witness was admissible. If they are not authority, within the principle df Walton *444 Shelly, then the rule, in its most limited shape, has been, as I have before contended, abandoned, except in name.
The next ground on which it is contended the witness was incompetent, is, that though he stood indifferent as to the subject matter of the suit, yet that if he destroyed the plaintiff’s right to recover, he would exonerate himself from the endorser’s costs, which he would be bound to reimburse to the defendant if he were cast in the action; and that therefore he had a direct pecuniary interest. According, to the English decisions in point, the witness was, notwithstanding his liability to costs, admissible. (Ilderton vs. Atkinson, 7 T. R. 476, Bert vs. Kershaw, 2 East, 458. 4 Taunton’s Rep. 464. Jones vs. Brooke, Chitty, 284.) And although there are very many cases in which witnesses liable to costs have been rejected as inadmissible, though otherwise indifferent, yet this exception appears to be well recognized. There are, then, authorities for and against the admissibility of the witness on this point; but those in favour of his competency are on the very point, while there is no contrary case exactly in point, however strongly analogous it may be. The modern cases have gone exceedingly far in establishing the competency of witnesses. (Ridley vs. Taylor, 13 East, 181, and Philips on Evidence, 54.) The rule, that where a person is liable to incidental or collateral costs, he shall be deemed incompetent, is among those *445 cases, I think, in which too strict a principle has. been adopted. If it were res integra, and were to be considered in the spirit of the present times on this subject, I jiííink it would'not be If the witness > stahd indifferent before the suit is commenced, should the act which renders his testimony necessary, make him incompetent ? There are large classes of cases in which the bias is much clearer; such as those of very near relations, persons interested in the question, agents, and a variety of others, who are properly deemed competent, and all objections against them referred to their credit. It would seem that a direct interest in the subject of the suit, would establish the boundaries of a rule strict enough; but the question, as a general question,is not open. On the case before us, however, the question is not only not decided against the competency of the witness, but the cases in point clearly and directly establish his competency; and we are to be directed by them, or return to the ancient gloomy prohibitions, instead of following the light which shines so clearly in our way. I am of opinion, in all these views of the question, that the witness was admissible; and therefore, on this ground, that a new trial ought to be granted.
opinion;
Cogdell, for the motion.
King, contra.